## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

Miguel A. Rico, (M34394),      )
                              )
           Petitioner,    )
                              )     Case No. 19-cv-04788
       v.            )
                              )     Hon. Franklin U. Valderrama
                              )
Teri A. Kennedy, Warden,    )
Pontiac Correctional Center,    )
                              )
          Respondent.   )

## MEMORANDUM OPINION AND ORDER

Petitioner Miguel A. Rico, a prisoner at the Pontiac Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his convictions for armed violence, home invasion, armed robbery, residential burglary, and aggravated kidnapping following two separate jury trials in two cases in the Nineteenth Judicial Circuit Court, Lake County, Illinois. *See* R. 1, R. 9. The Court denies the petition on the merits and declines to issue a certificate of appealability.

### Background[1]

Rico was tried and convicted in two separate jury trials of two different home invasions committed in September 2010. *People v. Rico*, 2018 IL App (2d) 15-0992-U,

---

[1]The following facts are drawn from the state court record, R. 19., the state appellate court's decisions on direct appeal in (1) the Chappel case, *People v. Rico,* 2014 IL App (2d) 120650-U (*Chappel Direct Appeal*), and (2) the Hagy case, *People v. Rico,* 2014 IL App (2d) 130071-U (*Hagy Direct Appeal*), and the state appellate court's consolidated decision on post-conviction appeal, *People v. Rico*, 2018 IL App (2d) 15-0992-U, ¶ 2 (*Consolidated Post-Conviction Appeal*). The state court's factual findings are presumed correct unless Rico rebuts this presumption by clear and convincing evidence. *Hartsfield v. Dorethy*, 949 F.3d 307, 309 n.1 (7th Cir. 2020) (citing 28 U.S.C. § 2254(e)(1); *Perez-Gonzalez v. Lashbrook*, 904 F.3d 557, 562

¶ 2 (*Consolidated Post-Conviction Appeal*). The first home invasion took place on September 1, 2010, at the Hagy residence in Lake Villa, Illinois. *See generally*, *People v. Rico*, 2014 IL App (2d) 130071-U (*Hagy Direct Appeal*). The second occurred one week later, approximately five miles away,[2] at the Chappel residence in Antioch, Illinois. *See generally*, *People v. Rico*, 2014 IL App (2d) 120650-U (*Chappel Direct Appeal*). The evidence at the trials showed the following:

## I.    Hagy Home Invasion

On September 1, 2010, Daniel Hagy returned home around lunchtime after attending class at the College of Lake County. *Hagy Direct Appeal*, ¶¶ 10–12; R. 19-26, pg. 109–10. He lived with his parents at the time, but neither were home. *Id.* ¶¶ 10–11. Upon his return, he noticed the garage door was open, and when he walked inside he saw that some of his electronics were stacked in a pile outside of the laundry room. *Id.* ¶ 12. Rico emerged from the living room holding a gun. *Id.* ¶ 13. Hagy described him as a Hispanic man, approximately 5'8", and wearing a hoodie, jeans, and sneakers with a bandana covering the bottom half of his face. *Id.*; R. 19-26 at pg. 115–17.

---

(7th Cir. 2018)); *see also Ward v. Hinsley*, 377 F.3d 719, 721 (7th Cir. 2004) ("[W]e presume the state court's recitation of the facts to be correct.").

2Antioch is approximately five miles north of Lake Villa. Google Maps, Google, *available at*: https://www.google.com/maps/dir/Lake+Villa,+IL/Antioch,+Illinois/ (last visited May 24, 2022).

Rico tied up Hagy's hands and feet with zip ties and duct tape. *Hagy Direct Appeal*, ¶¶ 14–15. Holding the gun to Hagy's back, Rico ordered Daniel to the storage unit in the basement where Daniel would stay for the remainder of the home invasion. *Id.* ¶ 15. Rico returned to the storage unit a few times over the next two hours, asking Hagy whether he had $500 in cash, where the keys to his mother's BMW were located, and what the combinations were for the family's two safes. *Id.* ¶¶ 17–18. At one point, Rico held Daniel at knife point and demanded he call his girlfriend and order her to bring him $500. *Id.* ¶ 17.

After some time, Daniel heard heavier footsteps coming from upstairs and realized his father was home. *Hagy Direct Appeal*, ¶ 19. His father heard Daniel calling to him from the basement and went downstairs, finding his son with duct tape around his ankles and wrists. *Id.* ¶¶ 19, 21. He helped his son out of the house and called the police. *Id.* ¶ 19. Once outside, Daniel realized his car was gone. *Id.* One of the family's safes was also stolen. *Id.* ¶ 22.

## II.     Chappel Home Invasion

A week later on September 8, 2010, William Chappel returned home from his morning walk and was about to pour himself a cup of coffee when he felt an arm around his chest and a knife at his throat. *Chappel Direct Appeal*, ¶ 3. Rico ordered Chappel to get on his knees and tied his hands behind his back with duct tape. R. 19-23 at pg. 403. He then took Chappel's car keys and locked him in the truck of his car. *Chappel Direct Appeal*, ¶ 3. Later, Rico opened the trunk, and Chappel could see that Rico had his stepdaughter and was forcing her into the trunk of their other vehicle.

3

*Id.* When the trunk opened again, Chappel observed Rico had his wife, Diane, and that she was bleeding. *Id.* Diane had attempted to grab a knife out of Rico's hand, but was cut during the struggle. *Consolidated Post-Conviction Appeal*, ¶ 9; R. 19-23 at pg. 464–65. Rico eventually bound Diane's hands and feet, and locked her in the downstairs bathroom. *Consolidated Post-Conviction Appeal*, ¶ 9.

After loading several electronics and other household items into the car William was locked in, Rico moved Chappel to the upstairs bathroom and stole his car along with the items inside. *Consolidated Post-Conviction Appeal*, ¶¶ 9–10; R. 19-23 at pg. 420–30. William later gave a description of the intruder that matched Rico, a Hispanic man, approximately 5'7" or 5'8", medium build, and wearing an orange-and-black checkered hoodie with dark cargo pants and sneakers. *Chappel Direct Appeal*, ¶ 3; R. 19-23 at pg. 406. Diane gave a similar description of the intruder. R. 19-23, at pg. 456, 463.

## III.  Rico's Arrest

On the day of the Chappel home invasion, Detective James Yanecek of the Lake County Sheriff's Department and his partner set up surveillance across the street from an abandoned home located in Round Lake Beach,[3] Illinois after receiving reports that officers had recovered the Chappels' vehicle near the property. *Chappel Direct Appeal*, ¶¶ 5–6; R. 19-24 at pg. 88–89. A few hours later, the detectives

---

[3]Round Lake Beach is less than ten miles south of Antioch and approximately five miles south of Lake Villa. Google Maps, Google, *available at*: https://www.google.com/maps/dir/Antioch,+IL/Lake+Villa,+IL/Round+Lake+Beach,+IL/ (last visited May 24, 2022).

4

observed Rico approach the abandoned home, walk past the "No Trespassing" sign posted on the property, and proceed towards the garage. *Chappel Direct Appeal*, ¶ 7.

The detectives illuminated Rico with their headlights and observed that he matched the physical description of the intruder and was wearing the same clothing described by the victims. *Id.*; R. 19-24 at pg. 94–95. They arrested Rico and brought him to the Lake County Sheriff's Department for questioning by detectives from both the Lake County Police Department and Lake Villa Police Department as part of their joint investigation of the Chappel and Hagy home invasions. R. 19-17 at pg. 69–73. Detective Yanecek conducted a search of the garage that Rico was headed toward at the time of his arrest and found various electronics that matched the description of the items stolen from the Chappel residence. R. 19-24 at pg. 96–98. Rico eventually confessed to both home invasions while in police custody, and provided a written and recorded statement. *Hagy Direct Appeal*, ¶ 27; *Consolidated Post-Conviction Appeal*, ¶ 21.

## IV. Rico's Pre-Trial Motions

Prior to trial, the court consolidated the Hagy and Chappel cases for purposes of joint hearings on Rico's motion to quash arrest and suppress evidence, and motions to suppress confession. R. 19-17 at pg. 41–42, 316–17.

### A. Motion to Quash Arrest and Suppress Evidence

Regarding his motion to quash arrest and suppress evidence, Rico argued his arrest was unlawful because the officers did not observe Rico in the commission of a

crime, and did not have probable cause nor reasonable suspicion based on articulable facts to believe he had committed a crime. R. 19-16 at pg. 74–76.

The State presented the testimony of Detective Yanecek. *Hagy Direct Appeal*, ¶ 6; R. 19-17 at pg. 29, 146. Detective Yanecek testified regarding the surveillance he and his partner set up across the street from the abandoned home in Round Lake Beach, explaining it was suspected that the Chappel intruder may return for the stolen vehicle which had previously been seen at the abandoned home and was subsequently parked nearby. *Hagy Direct Appeal*, ¶ 6; R. 19-17 at pg. 153–54. The detectives were relayed a description of the suspect from members of the Chappel family of a Hispanic male, around 5'5" or 5'6," medium complexion, and wearing a plaid-patterned hoodie and baggie blue pants. *Hagy Direct Appeal*, ¶¶ 5–6; R. 19-17 at pg. 155–56. The detectives were also informed that there could be stolen property inside the garage of the abandoned home. *Chappel Direct Appeal*, ¶ 5.

Shortly before midnight, the detectives observed Rico approach and quickly cross the street when he neared their police vehicle. *Chappel Direct Appeal,* ¶ 7. He proceeded toward the abandoned home and continued up the driveway. *Id.* Once Rico had advanced past the "No Trespassing" sign and toward the garage, Officer Yanecek turned on his headlights and emergency lights, and drove across the street. *Id.*; R. 19-17 at pg. 159. Rico stopped and turned around, at which point Detective Yanecek observed that Rico matched the description of the suspect. *Chappel Direct Appeal*, ¶ 7; R. 19-17 at pg. 160–61. Detective Yanecek arrested Rico, and he was transported to the police station. *Chappel Direct Appeal*, ¶ 7; R. 19-17 at pg. 161–62.

Based on Officer Yanecek's testimony, the State argued there was both probable cause to arrest Rico for trespass, and reasonable suspicion to believe Rico had committed the home invasion earlier that day. R. 19-17 at pg. 172–75. The trial court agreed with the State's argument and ruled that the detectives had reasonable suspicion based on articulable facts to approach Rico and to take him into custody. *Chappel Direct Appeal*, ¶ 7; R. 19-17 at pg. 212–14.

**B.    Rico's First Motion to Suppress Confession**

As for his first motion to suppress confession, Rico argued the detectives violated his *Miranda* rights during their post-arrest interrogation at the Lake County Sheriff's Department and sought suppression of all statements and confessions. *Consolidated Post-Conviction Appeal*, ¶ 12; R. 19-16 at pg. 67–73.

At the hearing on Rico's first motion to suppress confession, Detective Rochelle Tisinai of the Lake Villa Police Department explained that she and Detective Chris Dador of the Lake County Sheriff's Department first spoke with Rico shortly after midnight following his arrest. *Consolidated Post-Conviction Appeal*, ¶ 13. They met with Rico in a small interview room with a table and three chairs inside. *Id.* ¶ 21. Detective Dador read Rico his *Miranda* rights from a pre-printed form, and Rico signed a waiver. *Id.* ¶ 13; R. 19-17 at pg. 74. The officers began asking Rico questions about where he had been coming from and what he had been doing earlier that evening. *Consolidated Post-Conviction Appeal*, ¶ 13. Rico explained that he was living at his girlfriend's house in Round Lake Beach and was walking from there when he was arrested. *Post-Conviction Appeal*, ¶ 14; R. 19-17 at pg. 81. Detective Dador

showed Rico two photographs, one of a shoe impression at one of the houses and one of the bottom of Rico's shoes. R. 19-17 at pg. 98. The two appeared to match. *Id.*

At some point, Rico indicated he did not want to talk anymore, but the detectives continued to discuss the evidence they had obtained from their investigation. *Consolidated Post-Conviction Appeal*, ¶ 13; R. 19-17 at pg. 98–99. After about an hour and a half into the interview, Rico requested an attorney. *Consolidated Post-Conviction Appeal*, ¶ 13. At that point, the interview stopped. *Id.* Detective Dador left the two photographs on the table and told Rico to knock if he changed his mind. *Id.* The detectives then exited the interview room. *Id.*

For the next several hours, Rico was left alone, uninterrupted by any officers or detectives except for interactions during bathroom and meal breaks. *Consolidated Post-Conviction Appeal*, ¶ 24; R. 19-17 at pg. 218. Detective Robert Richards of the Lake County Sheriff's Department testified that while escorting Rico to the restroom around mid-afternoon the following day, Rico requested to speak with the "female detective." *Consolidated Post-Conviction Appeal*, ¶ 20; R. 19-17 at pg. 45. Detective Richards understood this to mean Detective Tisinai, and he informed her that Rico was asking to speak with her. *Consolidated Post-Conviction Appeal*, ¶ 20.

Detective Tisinai returned to the interview room at Rico's request. *Consolidated Post-Conviction Appeal*, ¶ 14. At this point, over twelve hours had passed since the midnight interview. *Id.* Rico wanted to know if Detective Tisinai had spoken to his girlfriend. *Id.* She reminded him that he had asked for an attorney and therefore she could not speak with him about the case. *Id.* Rico continued to ask

8

Detective Tisinai questions as to the status of their investigation, including whether they had gone to his girlfriend's high school or pulled her out of class, and whether they had talked to his parents. *Id.*; R. 19-17 at pg. 81–82. The detective again reminded Rico that she could not discuss the case with him. *Consolidated Post-Conviction Appeal*, ¶ 14.

Rico then asked Detective Tisinai if he could "have a smoke" and "chill with [her]." *Id.* ¶ 15; R. 19-17 at pg. 82. The detective understood "chill" to mean that Rico wanted to hang out in the interview room and have a conversation with her. *Consolidated Post-Conviction Appeal*, ¶ 15. She told Rico that she would have to read him his *Miranda* rights again and did so from a pre-printed form. *Id.* Rico executed another waiver and initialed the form next to each enumerated right. *Id.* Detective Tisinai then asked him about his gang involvement, and they discussed his recent financial issues and fear for his safety from other gang members. *Id.* ¶ 16. When she suggested the reason that he committed the home invasions was to sell the stolen electronics to protect himself and his family, Rico did not respond and made no further statements. *Id.* Detective Tisinai subsequently left the interview room. *Id.* At no point during their conversation did Rico request an attorney. *Id.* ¶ 61.

Three hours later, Rico again requested to speak with Detective Tisinai. *Consolidated Post-Conviction Appeal*, ¶ 17. This time, Detective Tisinai brought Detective Richards with her to the interview room. *Id.* Rico asked questions regarding their investigation, wanting to know what was going on with the case and whether they had spoken with anyone. *Id.*; R. 19-17 at pg. 90–91. The detectives advised Rico

9

that they had conducted a search warrant on his house and found the safe from the Hagy home invasion. *Consolidated Post-Conviction Appeal*, ¶ 17; R. 19-17 at pg. 90–91. Rico responded, "Well, you know you got me. What else do you want me to say?" *Consolidated Post-Conviction Appeal*, ¶ 17. The detectives then provided him more details about their investigation. *Id.*

The conversation lasted for a few hours, during which time Rico made various admissions and statements regarding the case. *Consolidated Post-Conviction Appeal*, ¶¶ 17, 21. The detectives gave Rico an opportunity to reduce his statement to writing, and obtained his consent to record his statement. *Id.* ¶¶ 17–18, 21. Detective Tisinai explained that she and Detective Richards left the room while Rico wrote his statement, and they did not discuss with him what to write. *Id.* ¶ 17. The detectives returned to the interview room to ask Rico questions for the recording. *Id.* ¶ 18. Rico never requested an attorney nor indicated that he wished to remain silent. *Id.* ¶¶ 18, 21.

In its ruling on the first motion to suppress confession, the trial court found the testimony of the detectives credible. *Consolidated Post-Conviction Appeal*, ¶ 23. It further found that Rico had invoked his right to remain silent during the midnight interview, but the detectives continued questioning him. *Id.* ¶ 24. The court ruled that any statements made after Rico invoked his right to remain silent and before he reinitiated contact with Detective Tisinai were inadmissible. *Id.*

As for the interview the following afternoon, the trial court determined Rico himself initiated contact with the detective, and engaged in a generalized discussion

10

of the investigation. *Consolidated Post-Conviction Appeal*, ¶ 25. The trial court also found that Rico knowingly and intelligently waived his rights upon being re-advised of the *Miranda* warnings and executing a second waiver form. *Id.*

Overall, the trial court concluded there was no evidence that the detectives badgered Rico or otherwise pressured or deceived him to obtain his statement. *Consolidated Post-Conviction Appeal*, ¶¶ 25–26. The trial court therefore denied Rico's motion to suppress except for the statements made during the specified time period following his indication that he wished to remain silent. *Id.* ¶ 26.

### C.   Rico's Second Motion to Suppress Statements

A few months later, Rico filed a second motion to suppress statements in which he argued his confession was obtained via the detectives' threats and promises, and was a "direct result of [his] will being overborne." *Consolidated Post-Conviction Appeal*, ¶ 27; R. 19-16 at pg. 116–20.

Detectives Richards and Tisinai testified at the hearing on the second motion to suppress. R. 19-17 at pg. 318, 330. Detective Richards denied threatening Rico or making any promises regarding leniency, but stated he may have told Rico that (1) Rico faced serious charges and could go to prison for a long time, and (2) that it was in Rico's interest to cooperate with the investigation. *Consolidated Post-Conviction Appeal*, ¶ 28. Detective Tisinai testified that she did not hear Detective Richards promise any deals to Rico or threaten him that he would face more time if he failed to cooperate. *Id.* ¶ 29. She further testified that she did not say anything to Rico regarding his cooperation or the severity of the charges he faced. *Id.*

11

Rico also testified at the hearing. *Consolidated Post-Conviction Appeal*, ¶ 30; R. 19-7 at pg. 340. He claimed that Detective Richards scared him into believing he would spend the rest of his life in prison for the two home invasions. *Id.* ¶ 30. He decided to confess because Detective Richards made a deal with him. *Id.* ¶¶ 30–31. Rico explained that he was told the State's Attorney was willing to drop a charge for sexual assault and offer him a six-year deal of which he would only have to serve three years. *Id.* ¶ 31. He alleged that he was told what to write in his confession, but could not recall the detectives providing him details about the case. *Id.*; R. 19-17 at pg. 355. Rico said he eventually agreed to have his statement recorded because of the deal he had been offered. *Id.* ¶ 31; R. 19-17 at pg. 355–56.

In its ruling on the second motion to suppress, the trial court first found that, based on Rico's education, conduct in court, and prior involvement in the criminal justice system, he understood the proceedings and the nature of the interrogation. *Consolidated Post-Conviction Appeal*, ¶ 32. The trial court was "hesitant" to believe the State's Attorney would become involved in negotiations in a case involving only one defendant, and did not believe the State had authorized any deals, including the fifty-percent prison time offer. *Id.* The trial court credited the detectives' testimony, but did not find Rico to be credible, nor that any promises or threats had been made to obtain his statement. *Id.* ¶ 33. The court concluded Rico's statements were voluntary and denied his second motion to suppress. *Id.*

V.    **Rico's Trials**

   A.    **Chappel Trial**

The Chappel case proceeded to trial first. *Consolidated Post-Conviction Appeal*, ¶ 34. Detective Richards and Tisinai testified at trial, and their testimony was consistent with their testimony during the pre-trial hearings. *Id.* Among other witnesses, the State presented the testimony of a footwear impressions expert who testified that the shoes Rico was wearing at the time of his arrest and the shoe impressions lifted from the Chappel residence were of similar shape, size, mold, and tread pattern, and had a similar logo at the bottom of the heel. R. 19-24 at pg. 231–60. A redacted version of Rico's recorded statement was also played for the jury. *Id.* at 305–06.

Rico testified for the defense. R. 19-24 at pg. 367. He claimed that prior to his arrest he had been smoking marijuana at a friend's house when his friend asked him to pick up a bag of money that was inside the garage of an abandoned home. *Id.* at 389–94. He explained that on the walk there, he did not realize that he had put on a pair of shoes that did not belong to him. *Id.* at 392–93. He denied any involvement in the Chappel home invasion. *Id.* at 394–95.

Following deliberations, the jury convicted Rico of armed violence, home invasion, armed robbery, and three counts of aggravated kidnapping. *Chappel Direct Appeal*, ¶ 2. He was sentenced to concurrent 30-year prison terms for each conviction. *Id.*

### B.  Hagy Trial

The State then proceeded with the Hagy case. *Consolidated Post-Conviction Appeal*, ¶ 35. Detective Richards again testified at trial, and the State introduced evidence of Rico's written statement. *Id.*; *Hagy Direct Appeal*, ¶ 28. The redacted video recording was also played for the jury. R. 19-26 at pg. 8–10.

Rico testified for the defense and denied committing any offenses at the Hagy residence. R. 19-26 at pg. 261–62. He claimed that on the day of his arrest, he was asked by a friend to pick up some merchandise that the friend was stashing in the garage of an abandoned home. *Id.* at 264–65. As for the Hagy's safe recovered from his parents' home, Rico explained that the same friend had brought it over earlier that day to ask for help cutting it open. *Id.* at 306–07.

Following the jury trial, Rico was convicted of residential burglary, home invasion, and aggravated kidnapping. *Hagy Direct Appeal*, ¶ 36. His residential burglary conviction merged with his conviction for home invasion, and he was sentenced to consecutive 30-year terms of imprisonment for home invasion and aggravated kidnapping. *Id.*

## VI.  Rico's Direct Appeals

Rico separately appealed his convictions in the Hagy (R. 19-1) and Chappel (R. 19-6) cases, arguing in both that his arrest was unlawful because it was not supported by probable cause and the evidence obtained as a result of his arrest should have been suppressed. R. 19-1 at pg. 11–16; R. 19-6 at pg. 27–31. In the Chappel appeal, the first case to be heard by the Illinois appellate court, Rico's claim was

14

denied on the merits and his convictions were affirmed. *Chappel Direct Appeal*, ¶¶ 9–16, 26. In the Hagy appeal, the state court rejected Rico's unlawful arrest claim based on its prior ruling in the Chappel case and affirmed all of Rico's convictions except for his aggravated kidnapping conviction. *Hagy Direct Appeal*, ¶¶ 44, 75, 77. The court found that the kidnapping was incidental to Rico's theft, reversed the conviction, and remanded the case for resentencing on the remaining conviction for home invasion. *Id.* ¶¶ 65, 75, 77. On remand, Rico was sentenced to a prison term of 30 years for home invasion. *Consolidated Post-Conviction Appeal*, ¶ 38.

Rico then filed separate *pro se* petitions for leave to appeal (PLA) to the Illinois Supreme Court. R. 19-5 at pg. 2–20 (Chappel PLA); R. 19-10 at pg. 2–20 (Hagy PLA). Only the Chappel PLA raised Rico's unlawful arrest claim. R. 19-5 at pg. 9–15. Both PLAs were denied by the Illinois Supreme Court. *People v. Rico*, 20 N.E.3d 1260 (Ill. 2014) (denying Rico's PLA in the Chappel case); *People v. Rico*, 23 N.E.3d 1205 (Ill. 2015) (denying Rico's PLA in the Hagy case).

## VII.    Rico's Post-Conviction Petitions and Consolidated Post-Conviction Appeal

In post-conviction proceedings, Rico filed separate *pro se* petitions in the Hagy and Chappel cases and raised various ineffective assistance claims. R. 19-16 at pg. 395–404) (Chappel post-conviction petition); R. 19-21 at pg. 471–79 (Hagy post-conviction petition). In both petitions, Rico argued that his appellate counsel was ineffective for (1) failing to argue on direct appeal that his *Miranda* rights were violated when he continued to be questioned after requesting an attorney, and (2)

failing to argue that his statements to the police were made involuntarily. R. 19-16 at pg. 396–400; R. 19-21 at pg. 473–77. The trial court summarily dismissed Rico's *pro se* petitions in both cases. R. 19-16 at pg. 452–64 (Chappel summary dismissal order); R. 19-21 at pg. 504–17 (Hagy summary dismissal order).

In his post-conviction appeal, Rico, through counsel, filed a consolidated brief that raised the same two ineffective assistance of appellate counsel claims regarding his *Miranda* rights and confession. R. 19-11 at pg. 1–41. The post-conviction appellate court rejected both ineffective assistance claims on the merits and affirmed the trial court's summary dismissal. *Consolidated Post-Conviction Appeal*, ¶¶ 70, 83, 85. Rico presented his ineffective assistance claims regarding the alleged *Miranda* violation and involuntary statements to the Supreme Court of Illinois in a consolidated *pro se* post-conviction PLA. R. 19-15 at pg. 2–30. The Supreme Court of Illinois denied Rico leave to appeal, *People v. Rico*, 119 N.E.3d 1052 (Ill. 2019), and he then filed the instant habeas corpus petition.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may "entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C § 2254(a). A court may provide habeas relief only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

16

of the United States" or if the state proceedings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." *Id.* § 2254(d). "For a decision to be contrary to clearly established law, the decision must be 'opposite to that reached by [the Supreme] Court on a question of law' or different from a Supreme Court decision with 'materially indistinguishable facts.'" *Diaz v. Butler*, 2021 WL 25564, at *4 (N.D. Ill. Jan. 4, 2021) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). While a habeas petition challenges a petitioner's custody, it is not a mechanism to remedy errors of state law. *Id.* at *5 (citing *Dellinger v. Bowen*, 301 F.3d 758, 764 (7th Cir. 2002)).

"A state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal quotations marks and citations omitted). In other words, "a habeas petitioner must fully and fairly present his federal claims through one full round of state court review before he files his federal habeas petition." *Diaz*, 2021 WL 25564, at *5. To fairly present a claim, "a petitioner must include both the operative facts and the controlling legal principles on which the claim is based, and a petitioner also must alert the state court that the claim raised is based on federal law." *Id.* (internal citation omitted). A § 2254 claim can be procedurally defaulted in two ways. *Hunt v. Mueller*, 2020 WL 5076662, at *5 (N.D. Ill. Aug. 27, 2020). The first occurs "when a prisoner fails to fully exhaust state court remedies for his federal claim and no longer has the ability to do so under the

17

state's procedural laws." *Id.* (citing *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016)). The second is "where the state courts declined to address a petitioner's federal claims because the petitioner did not meet state procedural requirements." *Id.* (citing *Thomas*, 822 F.3d at 384. "'A state law ground is independent when the court actually relied on the procedural bar as an independent basis for its disposition' and 'is adequate when it is a firmly established and regularly followed state practice at the time it is applied.'" *Id.* (quoting *Thompkins v. Pfister*, 698 F.3d 976, 986 (7th Cir. 2012)). Put simply, "when a state court refuses to reach the merits of a petitioner's federal claims because they were not raised in accord with the state's procedural rules . . . that decision rests on independent and adequate state procedural grounds." *Kaczmarek v. Rednour*, 627 F.3d 586, 591 (7th Cir. 2010).

"A federal court on collateral review will not entertain a procedurally defaulted constitutional claim unless the petitioner can establish cause and prejudice for the default or that the failure to consider the claim would result in a fundamental miscarriage of justice. *Kaczmarek*, 627 F.3d at 591. "In order to demonstrate cause for failure to exhaust, [a petitioner] must demonstrate that some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) (internal quotation marks and citation omitted). "A fundamental miscarriage of justice occurs when a habeas petitioner establishes that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Diaz*, 2021 WL 25564, at *5 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

### Analysis

Rico's *pro se* § 2254 petition presents the following claims for this Court's consideration:

| | |
|---|---|
| <u>Claim 1</u>: | Rico's arrest for criminal trespass was unlawful because the police lacked probable cause; and |
| <u>Claim 2</u>: | Rico's appellate counsel was ineffective for failing to argue on direct appeal that Rico's *Miranda* rights were violated. |

(R. 9, pg. 10–12).

As explained below, none of Rico's claims warrant federal habeas relief.

## I.     Claim One is Non-Cognizable and Withdrawn by Rico

Rico first asserts that his arrest for criminal trespass was unlawful, and the inculpatory statements obtained after his arrest should have been suppressed. R. 9 at pg. 10–11. He contends the detectives did not conduct an investigatory stop, which would only require reasonable suspicion, but rather the entire encounter was a warrantless arrest that demanded probable cause. *Id.*

Rico's claim raises a Fourth Amendment challenge and implicates the exclusionary rule to the extent statements were obtained as a result of an unlawful arrest. *See Beck v. State of Ohio,* 379 U.S. 89, 91 (1964); *Wong Sun v. United States,* 371 U.S. 471, 485–86 (1963). Fourth Amendment claims, however, are non-cognizable on federal habeas review so long as the state court granted the defendant a full and fair hearing on his claim. *Monroe v. Davis*, 712 F.3d 1106, 1112–13 (7th Cir. 2013) (citing *Stone v. Powell*, 428 U.S. 465, 494 (1976)). A "full and fair opportunity

guarantees the right to present one's case, but it does not guarantee a correct result." *Cabrera v. Hinsley*, 324 F.3d 527, 532 (7th Cir. 2003) (internal quotations omitted); *see also Miranda v. Leibach*, 394 F.3d 984, 998 (7th Cir. 2003). "Absent a subversion of the hearing process," Rico is not entitled to federal habeas review of his Fourth Amendment claim. *Cabrera*, 324 F.3d at 531–32.

In his amended reply brief,[4] Rico concedes his unlawful arrest challenge is barred by *Stone v. Powell*, and asserts that he no longer wishes to proceed on this claim. R. 35 at pg. 2. Rico is permitted to withdraw claims from his § 2254 petition in his reply brief. *See United States ex rel. Walker v. Yurkovich*, No. 10 C 1959, 2010 WL 3937484, at *1 (N.D. Ill. Oct. 5, 2010) (citing *United States ex rel. Jackson v. Page*, 972 F. Supp. 1140, 1149 n.10 (N.D. Ill. July 31, 1997) ("Courts permit parties to withdraw [] claims by abandoning them in a reply brief.")). Accordingly, the Court will limit its review to Rico's ineffective assistance claim (Claim Two). Claim One is denied.[5]

---

[4]Rico's original reply brief included the same request to withdraw Claim One. (R. 24, pg. 2)

[5]Notwithstanding Rico's request to withdraw Claim One, he is correct that the claim is barred from federal habeas review. Following a consolidated hearing on Rico's motion to quash and suppress, the trial court determined that the detectives had "reasonable suspicion based on articulable facts" to approach Rico and take him in to custody. R. 19-17 at pg. 212–14. The trial court noted that Rico matched the description of the suspect, the vehicle stolen from the home invasion was parked in the same general area, the detectives had information that Rico may be armed, and Rico was the only individual who proceeded up the driveway and past the "No Trespassing" sign during the detectives' surveillance of the area. *Id.*

On direct review, the state appellate court acknowledged Rico's correct assertion that warrantless arrests must be supported by probable cause and noted the trial court did not clarify which of the crimes justified the detectives' arrest of Rico: criminal trespass based on probable cause, or home invasion based on reasonable suspicion that ripened to probable

## II.      Claim Two is Meritless

Rico next argues that his appellate counsel was ineffective for failing to argue

that the detectives violated his *Miranda* rights by continuing to question him about

the case after he invoked his right to counsel. R. 9 at pg. 10, 12. He contends that his

request to "chill" with Detective Tisinai did not constitute a waiver of his right to

counsel, and therefore any statement made after his request for an attorney should

have been suppressed. *Id.*

The post-conviction appellate court was the last state court to address Rico's

claim on the merits, and thus is the relevant decision for this Court's consideration.

*See Makiel v. Butler*, 782 F.3d 882, 896 (7th Cir. 2015) (citing *Greene v. Fisher*, 565

U.S. 34, 40 (2011)). To be entitled to federal habeas relief, Rico must demonstrate the

state court's decision was either "contrary to, or an unreasonable application of,

---

cause. *Chappel Direct Appeal*, ¶¶ 10–12 (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949) to explain when probable cause exists). The appellate court explained, however, that the trial court's oversight was of no consequence because the record supported both theories of arrest. *Chappel Direct Appeal*, ¶¶ 10–16.

With respect to the trespass, the appellate court determined the detectives had probable cause to believe Rico was not authorized to enter the abandoned home when he approached the property on foot in the middle of the night and proceeded directly toward the garage, where it was believed stolen property was being stored. *Chappel Direct Appeal*, ¶¶ 13–14. And on these same facts, the appellate court concluded the detectives had at least reasonable suspicion to believe that Rico was involved in the home invasion, which immediately ripened to probable cause once they approached and could observe from the light of their headlights that he matched the description of the suspect. *Id.* ¶ 16.

It is thus apparent from the record that both the trial court and the appellate court gave Rico a full and fair opportunity to present and litigate his Fourth Amendment claim. As Rico concedes, Claim One is therefore non-cognizable on federal habeas review and denied.

clearly established federal law as determined by the Supreme Court of the United States," or the state court decision was based upon "an unreasonable determination of facts" in light of the evidence before it. 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This is a "highly deferential standard for evaluating state-court rulings" that is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotations and citations omitted).

Claims of ineffective assistance of appellate counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285–86 (2000); *Walker v. Griggin*, 835 F.3d 705, 708 (7th Cir. 2016). Rico must therefore establish both constitutionally deficient performance and prejudice. *Walker*, 835 F.3d at 708. "Because appellate counsel is not required to raise every non-frivolous issue on appeal, appellate counsel's performance is deficient under *Strickland* only if she fails to argue an issue that is both 'obvious' and 'clearly stronger' than the issues actually raised." *Makiel*, 782 F.3d at 898 (internal citations omitted); *see also Winfield v. Dorethy*, 956 F.3d 442, 455 (7th Cir. 2020). As for prejudice, Rico must demonstrate there is a "reasonable probability" that the outcome of his direct appeal would have been different but for appellate counsel's errors. *Shaw v. Wilson*, 721 F.3d 908, 918 (7th Cir. 2013) (citing *Strickland*, 466 U.S. at 694).

The Illinois post-conviction appellate court rejected Rico's claim, concluding appellate counsel was not ineffective because the *Miranda* argument was meritless

and had "no arguably reasonable chance of success on appeal" given that Rico reinitiated contact with Detective Tisinai and signed a written *Miranda* waiver. *Consolidated Post-Conviction Appeal*, ¶¶ 64, 66-67, 70. The state court's decision was not "contrary to" federal law, as it correctly identified that *Strickland* applies to claims of ineffective assistance of appellate counsel and cited the controlling two-prong test. *Id.* ¶ 48. Equally, the post-conviction appellate court's opinion was not unreasonable.

An individual subject to custodial interrogation has the right to remain silent and the right to have counsel present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 468–73 (1966). If the right to counsel is invoked, the interrogation must cease "until counsel has been made available . . . unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). A suspect is considered to have initiated further dialogue where he "evince[s] a willingness and a desire for a generalized discussion about the investigation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045–46 (1983). Initiation alone, however, does not necessarily constitute a waiver of the accused's earlier request for assistance of counsel. *United States v. Robinson*, 586 F.3d 540, 545 (7th Cir. 2009). There must also be a finding that, under the totality of the circumstances, the purported waiver was "knowing and intelligent." *Edwards*, 451 U.S. at 486 n.9. Thus, statements made after the right to counsel has been invoked are admissible upon a finding that the accused "(a) initiated further discussions with

the police, and (b) knowingly and intelligently waived the right he had invoked."
*Smith v. Illinois*, 469 U.S. 91, 95 (1984).

The state appellate court's factual finding that Rico re-initiated contact with
Detective Tisinai the following afternoon and, in doing so, evinced a willingness and
desire for general discussion about the investigation is "presumed to be correct." 28
U.S.C. § 2254(e)(1). Rico presents no "clear and convincing evidence" to rebut this
presumption. *Id.* Instead, he asserts that his request to "chill" was not a desire to talk
about the case, but rather an attempt to change the topic of conversation following
Detective Tisinai's reminders that they could not discuss the investigation. R. 35 at
pg. 6–8, 10. His argument is unavailing.

In the re-initiation context, courts must determine whether a subsequent
waiver was compelled at "the authorities' behest," or whether the waiver was the
product of the "suspect's own instigation." *Maryland v. Shatzer*, 559 U.S. 98, 104–05
(2010); *see also Bradshaw*, 462 U.S. at 1046–47 (explaining the trial court conducted
the appropriate inquiry where it "found that the police made no threats, promises, or
inducements to talk, that defendant was properly advised of his rights and
understood them and that . . . [the defendant] changed his mind without any
impropriety on the part of the police."). Here, the record demonstrates that after Rico
requested counsel during the midnight interview, the detectives stopped the
interrogation and left him in the interview room where he remained unbothered for
the next several hours. Beyond responding to his requests to use the restroom or for
meals, there is no evidence of any "badgering" by the police to resume discussions.

*See Bradshaw*, 462 U.S. at 1044 (providing that the *Edwards* rule was "designed to protect an accused in police custody from being badgered by police officers.").

Instead, the conversation only resumed after Rico specifically requested to speak with Detective Tisinai and began asking her questions about the status of the investigation. The detective did not provide any information in response to Rico's questions; rather, she repeatedly reminded him of his rights after having requested an attorney. It was not until Rico requested to "chill" and was re-read his *Miranda* rights that further dialogue regarding Rico's gang affiliation and financial hardships resumed. Rico's actions thus demonstrated the requisite willingness to engage in a conversation about the investigation, and it was therefore not unreasonable for the state appellate court to reach its conclusion. *See Bradshaw*, 462 U.S. at 1045–56 (finding *Edwards* rule satisfied where defendant asked "Well, what is going to happen to me now?"); *see also Velez v. Atchison*, No. 12 C 07518, 2013 WL 4659566, at *10 (N.D. Ill. Aug. 30, 2013) (finding that the defendant evinced a willingness to discuss the pending investigation where he knocked on the door, requested to speak to the detective, and then waived his *Miranda* rights after being reminded he did not have to speak to the police).

Rico's waiver of his right to counsel was also made knowingly and intelligently. After initiating contact with Detective Tisinai, a factor to be considered as part of the totality of the circumstances, *Edwards*, 451 U.S. at 486 n.9, Rico was re-advised of his *Miranda* rights, acknowledged his understanding of each right, and signed the waiver form. *See United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001) (finding

valid waiver requirement fulfilled where suspect, after reinitiating conversation with authorities, was advised of her rights and then signed a waiver form). And even though Rico did not give his statement until the final interview with the detectives three hours later, the short lapse in time did not invalidate his waiver. *See United States ex rel. Patton v. Thieret*, 791 F.2d 543, 547–48 (7th Cir. 1986) (providing lapse in time does not always necessitate that *Miranda* warnings be given again); *see also United States ex rel. Henne v. Fike*, 563 F.2d 809, 814 (7th Cir. 1977) (finding nine hours between *Miranda* warnings and waiver not too long).

Further, the latter conversation was convened at Rico's request, who once again evinced a willingness to discuss the case by asking about the status of the investigation. Having previously requested counsel and having been provided reminders of the significance of this right throughout the day, Rico knew how to invoke his right but did not do so after executing the second waiver form earlier that afternoon. Accordingly, the state court's finding that Rico validly waived his right was reasonable. *Huerta*, 239 F.3d at 873.

In sum, the statements made after Rico's initial request for counsel were admissible because Rico himself reinitiated contact with the detectives and validly waived his right.[6] Given that Rico's *Miranda* claim was without merit, it was

---

[6]In his reply brief, Rico argues that the *Edwards* rule was first violated at the midnight interview when the officers left the shoe photographs with him and told him to knock on the door if he changed his mind. R. 35 at pg. 5–6. He contends the detectives' conduct amounted to interrogation which tainted his later waiver. *Id.* Rico did not raise this argument on post-conviction appeal, (R. 19-11), nor did he do so in his habeas corpus petition. (R. 9). Arguments raised for the first time in reply briefs are waived. *See Stechauner v. Smith*, 852. F.3d 708,

26

reasonable for the state appellate court to reject his ineffective assistance claim. *See Warren v. Baenen*, 712 F.3d 1090, 1104 (7th Cir. 2013) ("Counsel is not ineffective for failing to raise meritless claims."). Claim Two is denied.

For the reasons stated above, the habeas corpus petition is denied.

## III.    Certificate of Appealability and Notice of Appeal Rights

Rico is advised that this is a final decision ending his case in this Court. If Rico wishes to appeal, he must file a notice of appeal with this Court within 30 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Rico need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Rico wishes

---

721 (7th Cir. 2017).

Beyond the waiver, statements regarding the evidence are generally not considered the "functional equivalent" of interrogation. *See Easley v. Frey*, 433 F.3d 969, 971–74 (7th Cir. 2006) (citing *Rhode Island v. Innis,* 446 U.S. 291, 301 (1980) (upholding finding that officer's statement to the defendant about "what lies ahead," including the evidence they had and the potential for the death penalty, did not amount to interrogation)). Thus, the detectives' act of leaving the photographs did not rise to the level of a *Miranda* violation as Rico contends. *Id.* at 974 (citing *United States v. Payne*, 954 F.2d 199, 202 (4th Cir. 1992) ("[I]nformation about the evidence against a suspect may also contribute to the intelligent exercise of his judgment regarding what course of conduct to follow.")). And it cannot be overlooked that over 18 hours had passed between the midnight interview and Rico's statement, notably made after twice requesting to speak with the detectives, and after he had been re-read *Miranda* warnings and executed a second waiver form. *See United States v. Thomas*, 11 F.3d 1392, 1398 (7th Cir. 1993) (providing, in dicta, that an *Edwards* violation is harmless where a confession was initiated by a suspect who maintained her silence for several hours after improper questioning by police).

Even if the detectives' conduct at the midnight interview violated Rico's *Miranda* rights, the record does not support a finding that the admission of his statement had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Rico testified at both the Chappel and Hagy trials regarding how the statement was obtained, provided his version of events leading up to his arrest, and denied his involvement in the home invasions. R. 19-24 at pg. 367–95; R. 19-26 at pg. 261–308. Unsurprisingly, the jury did not believe Rico's stories.

27

the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

The Court declines to issue a certificate of appealability. Such a certificate "may not issue 'unless the applicant has made a substantial showing of the denial of a constitutional right.'" *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (quoting 28 U.S.C. § 2253(c)). Rico must show that reasonable jurists could debate whether this Court should have resolved his claims differently or that the issues are "adequate to deserve encouragement to proceed further." *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing *Slack*, 529 U.S. at 484) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Rico cannot meet this standard.

**Conclusion**

Rico's habeas corpus petition (R. 1, R. 9) is denied on the merits. Any other pending motions are denied as moot. The Court declines to issue a certificate of appealability. The Clerk shall: (1) terminate Respondent Teri A. Kennedy and replace her with Rico's current custodian, Mindi Nurse, Acting Warden, Pontiac Correctional Center, (2) alter the case caption to *Rico v. Nurse*; and (3) enter a judgment in favor of Respondent and against Rico. Civil Case Terminated.

Dated: 11/09/2022

FRANKLIN U. VALDERRAMA
United States District Judge